UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

FRANK DAMON, JR.,

                                   Plaintiff,

        v.                                              **DECISION AND ORDER**
                                                        04-CV-0746S

UNITED PARCEL SERVICE; WITH
CAROL SCHMAUS, DAWN
LEWANDOWSKI AS AIDERS AND
ABETTORS,

                                   Defendants.

## I.  INTRODUCTION

Plaintiff Frank Damon, Jr. commenced this employment discrimination action by

filing a Complaint in the United States District Court for the Western District of New York.

(Docket No. 1.)  Damon subsequently filed an Amended Complaint on April 11, 2007.

(Docket No. 35.)   Therein, he alleges that Defendant UPS and two of its employees

discriminated against him and subjected him to a hostile work environment based on his

gender.  Plaintiff brings this action pursuant to Title VII of the Civil Rights Act of 1964, 42

U.S.C. §§ 2000e et seq. (hereinafter, "Title VII") and the New York State Human Rights

Law, N.Y. Exec. L. §§ 290 et seq. (hereinafter, "NYHRL").  Presently before this Court is

Defendants' Motion for Summary Judgment.[1]  (Docket No. 56.)  Plaintiff opposes the

motion.[2]  For the reasons stated below, Defendants' motion is granted.

---

[1]In support of its Motion for Summary Judgment, Defendants filed a memorandum of law, Rule 56
Statement of Undisputed Facts, Certification of Adin C. Goldberg, Esq., with attached exhibits, and reply
memorandum of law.

[2]In opposition to Defendants' motion, Plaintiff filed a memorandum of law, Attorney Declaration,
Plaintiff Declaration, Rule 56 Statement of Disputed Facts, and attached exhibits.

## II. BACKGROUND

### A.    Facts

Frank Damon, Jr. (hereinafter, "Damon") was hired by Defendant United Parcel Service (hereinafter, "UPS") on December 14, 1977. (Defendants' Stmt.,[3] ¶ 1.) Damon was a package car driver until February 14, 2000, when he transferred to an inside position as a "hub sorter." (Id. at ¶ 2; Damon Dep., pp. 22: 4-5.) Damon remained in a full-time hub sorter position throughout the relevant time period at issue. (Goldberg Aff., Ex. D.) His full-time shift was scheduled from 5:00 p.m. to approximately 2:00 a.m., spanning UPS's twilight shift and night shift. In contrast, part-time employees are assigned to either the twilight or night shift only. (Damon Dep. 21:15-17.)

Damon worked his twilight shift hours, from 5:00 p.m. to 10:00 p.m., in the hub's "small sort" area. (Defendants' Stmt., ¶ 4.) He typically took a lunch break before working the night shift. Damon was assigned a variety of hub sorter tasks on the night shift, including sweeping and small sort. (Damon Dep. 29:10-13.) Defendant Dawn Lewandowski (hereinafter, "Lewandowski") was Damon's supervisor in the small sort area. (Defendants' Stmt., ¶ 8.) Beginning sometime in 2000, Damon also worked on occasion in an area called the "damage cage." (Damon Dep. 11:17-19.)

In February 2001, after Damon was certified as a hazardous material acceptance auditor, his supervisor asked if he'd be willing to work in the damage cage on a nightly basis auditing haz-mat packages, re-taping damaged packages, and loading late packages

---

[3]Referring to Defendants' Rule 56 Statement of Undisputed Facts, which contains citations to the record evidence in this case. This Court has confirmed and is satisfied that the evidence cited supports the assertions therein. Cf. Holtz v. Rockefeller & Co., Inc., 258 F.3d 62, 74 (2d Cir., 2001) (holding that factual allegations contained in a Rule 56.1 Statement that find no support in the record evidence must be disregarded and the record reviewed independently).

onto an air trailer—work that sometimes carried into overtime. (Id. 11:20-12:22, 35:3-7, 53:15-22.) Damon accepted and began working an average of 15 to 18 overtime hours per week. (Id. 46:3-6.)

### 1. Disparate Treatment

For about a one month period in January and February 2002, Damon was pulled out of the damage cage and reassigned to small sort on the night shift. (Id. 46:9-11.) Damon's hourly rate of pay was not affected by this reassignment. (Defendants' Stmt., ¶ 20.) Supervisor Joe LoRusso (hereinafter, "LoRusso") advised Damon that UPS had issued orders to control hours, which Damon understood meant controlling the cost of overtime pay. (Damon Dep. 48:5-11, 49:6-9.) Part-time workers were assigned to perform the damage cage work Damon had been doing. (Id. 47:4-7.) In particular, a male part-time employee, Gary Skobjak, was assigned to the air trailer. (Id. 47:8-14.)

Damon is a member of Local 449 of the International Brotherhood of Teamsters. (Defendants' Stmt., ¶ 10.) Local 449 entered into a collective bargaining agreement (hereinafter, "CBA") with UPS, which states, in relevant part,

> "Preference shall be given to employees older in service and in order of their seniority to the *extra work* available within their classification after he/she has completed his/her day's work provided that such employees are available at such times as the work is assigned and are qualified to perform the work required. In no event may employees displace other employees who have not completed their assignment."

(See National Master Agreement, pp. 166, Art. 57, §1, emphasis added.) Traditionally, senior employees at UPS were given the option of staying to do extra work or electing to go home. (See Opinion and Award from New York State Employment Relations Board.) Damon felt that he should have had the option to work overtime over part-time employees

because of his seniority, so he wrote around 20 grievances to his union regarding his move to the small sort area. (Damon Dep. 49:22-50:6, 52:9-53:14.)

In response to Damon's grievances, a meeting was held on February 26, 2002 between Local 449 representatives and UPS. (Defendants' Stmt., ¶ 22.) In settlement of the grievance, Defendant Carol Schmaus (hereinafter, "Schmaus"), agreed to give Damon one hour's pay and proposed to assign Damon to the damage cage every night. (Id. at ¶ 23.) Even though his overtime hours would be cut back to 10 to 12 hours a week because package re-taping was being shifted to another hub area, Damon agreed to the proposal and to drop the grievances. (Damon Dep. 55:2-56:10, 57:10-15.)

Damon worked in the damage cage until January 2003, when he was again assigned to work in the small sort during his night shift hours. (Id. 69:12-16.) Nevertheless, between January 21 to February 6, Damon continued to be sent to the damage cage at the end of his regular shift to work overtime with three other males who were assigned there. (Id. 89:5-24.) On February 6, Damon was told to punch out at the end of his shift as he would no longer be going to the damage cage. (Id. 90:17-20.) Thereafter, Damon frequently requested to go to the damage cage at the end of his night shift, but was almost always turned down. (Id. 117:20-118:4.) Damon identified five female and three male part-time employees who were assigned to the damage cage after January 21, 2003. (Id. 118:12-121:20.)

At some point, two UPS supervisors advised Damon that the work reassignment was out of their hands and it was coming from two levels above them. (Id. 76:6-23.) Damon again filed several grievances under the CBA regarding his night shift reassignment and the direction that he not go to the damage cage at the end of his shift. (Id. 74:21-24,

91:18-92:3.)  A meeting relative to the grievances was held on February 26, 2003.  Damon was told that UPS could no longer honor the February 2002 grievance settlement because operational costs had increased and part-time employees could perform the damage cage work more cost effectively.  (Id. 93:5-15.)  Damon concedes that all part-time damage cage work is done at a lower hourly rate than he receives, and at straight-time pay, whereas Damon's assignment there could result in overtime pay.  (Id. 48:23-49:9.)

In January of 2003, Damon was informed that his haz-mat duties would be phased out.  (Defendants' Stmt., ¶ 39.)  Several UPS management employees observed Damon performing his haz-mat duties and commented that he was taking longer than necessary to handle packages.  (Id. at ¶ 41.)  Eventually, two male employees were trained to do haz-mat work and replaced Damon in 2004.  (Id. at ¶ 42.)  Leaving haz-mat work did not affect Damon's pay, but did reduce his opportunity for overtime hours.  (Damon Dep. 9:17-22.)

## 2.    Hostile Work Environment

Supervisor Ralph Russo, Jr. (hereinafter, "Russo") testified that UPS employees receive the company's written professional conduct and anti-harassment policy each year.  (Russo Dep. 17:7.)    Employees must acknowledge that they received the policy and reviewed it.  (Defendants' Stmt., ¶ 44.)  Damon, however, denies ever receiving a copy of the UPS policy and UPS has failed to offer proof to the contrary.  (Damon Dep. 206:5.)  Russo further stated that employees also receive training regarding the policy.  (Russo Dep. 17:20-23.)  He explained that under the company's policy, if an employee feels they are being discriminated against, they should report the incidents to their manager.  (Id. 18:8-10.)  The manager would then notify the Human Resources Department, who sets up a confidential meeting.  (Id. 17:11; 8:12.)  If an employee is uncomfortable reporting to their

manager, they can call the UPS complaint hotline. (Id. 19:9-12.) Employees can find the 1-800 number posted in the building. (Damon Dep. 141:6.)

### a. Allegations Against Schmaus

Despite UPS's anti-harassment policies and employee training, Damon alleges he received several hostile comments from Schmaus beginning in 2002, pertaining to his appearance and work ethic. For instance, she commented on a shirt he was wearing from Tops Market and asked if it was a place he went after work to get drunk. (Defendants' Stmt., ¶ 29.) Schmaus also criticized Damon's haircut and beard, asking how his wife put up with him looking like that. (Damon Dep. 59:4-7.) Damon felt those comments were out of line because there was no dress code or appearance code in the hub. (Id. 59:12.)

Schmaus also singled Damon out among co-workers—male and female—yelling at him to hurry up and work faster. (Defendants' Stmt., ¶ 48.) For instance, on December 19, 2003, Schmaus berated Damon for talking to a co-worker at his work station and threatened to fire him. (Damon Dep. 156:8-12.) Damon explained that he was working and that the co-worker approached him. (Id. 158:15-20) Schmaus simply walked away after confirming that Damon was re-taping envelopes, as he was instructed to do by Lewandowski. (Defendants' Stmt., ¶ 67.) No disciplinary action was taken against Damon. (Id. at ¶ 68.)

### b. Allegations Against Lewandowski

Damon also has multiple complaints about his treatment by Lewandowski beginning in 2003. For instance, on December 10, 2003, Damon returned from a late lunch and was walking around the building when Lewandowski ordered him to do re-tapes and other work.

(Id. at ¶ 54.)  Damon stated he would be glad to after his lunch break was finished in eight

minutes.  (Id. at ¶ 55.)  Damon's shift was ending after his lunch break so Lewandowski

commented, "why bother." (Lewandowski Dep. 53:18.) Damon alleges Lewandowski used

profane language towards him and called LoRusso, who instructed Damon to punch out

as soon as he finished his lunch.  (Damon Dep. 134:9-10.)

Damon responded to his alleged mistreatment by filing a grievance with the Union.

(Id. 140:12.)  He then called UPS's employee complaint hot-line on December 11th.  (Id.

141:6-11; See UPS Employee Concern Resolution Process Call Report.)  Damon told the

complaint line that he had been "verbally abused by Miss Lewandowski."  (Damon Dep.

141:22-23.)   Dave Quinn, employee relations manager at that time, investigated the

complaint and found the allegations to be unsupported.  (Defendants' Stmt., ¶ 61.)  No

discipline was taken and the investigative report suggested Damon's dissatisfaction over

not working more overtime was a factor for his grievances.  (See UPS Employee Concern

Resolution Process Call Report.)

On another occasion, in 2004 Damon was looking up at a ceiling fan when

Lewandowski suggested he "take a picture."  (Id. at ¶ 62.)  Lewandowski thought he was

looking at overhead belts that were jammed with packages rather than the fan.  (Id. at ¶

63.)   Damon recalled that Lewandowski yelled at other male co-workers at times, but

states that she did not use profanity with anyone else.  (Defendants' Stmt., ¶ 65.)

### 3.    New York State Employment Relations Board Hearings

The Union pursued grievances, relating to overtime assignments from Damon and

others, in arbitration.  (See Opinion and Award from New York State Employment Relations

Board.) Hearings were held on October 19 and November 15, 2007 in front of Arbitrator

Stuart M. Pohl, of the New York State Employment Relations Board, to determine whether UPS violated the CBA and violated the company's past practice by sending full-time employees home at the completion of their shifts, despite their desire to work overtime. (Defendants' Stmt., ¶ 71.)

During his hearing testimony, Damon admitted that the work to be completed at the end of his shift was not considered "extra work" under Article 57, and thus did not require UPS to assign the work according to seniority. (Id.) Additionally, Damon conceded that UPS had the right to send full-time employees home at the completion of their eight hour shift, given there was no contractual guarantee for overtime work. (Id.) After hearing all of the testimony, Arbitrator Pohl concluded that UPS did not violate the CBA and did not have a longstanding, unequivocal past practice of guaranteeing overtime to full-time employees. (Defendants' Stmt., ¶ 74.) The grievances were subsequently denied. (See Opinion and Award from New York State Employment Relations Board.)

**B.      Procedural History**

Damon filed a charge of discrimination with the EEOC on March 19, 2004, alleging discrimination on the basis of his gender from October 1, 2003 until February 2, 2004. (Defendants' Stmt., ¶ 69.) The EEOC investigated Damon's charges and was unable to conclude that the allegations amounted to violations of Title VII. (Id. at ¶ 70.) A Notice of Suit Rights was mailed July 14, 2004. (Id.)

Damon filed his Complaint with the Clerk of the Court on September 16, 2004 and the case was assigned to the Honorable John T. Elfvin. (Docket No. 1.) Defendants filed

an Answer thereto on April 26, 2005. (Docket No. 4.) Damon filed an Amended Complaint on April 11, 2007. (Docket. No. 35.) The case was reassigned to Chief Judge William M. Skretny following Judge Elfvin's retirement. (Docket No. 42.) The parties completed discovery and on December 1, 2008, Defendants filed the instant Motion for Summary Judgment. (Docket No. 56.)

## III. DISCUSSION AND ANALYSIS

### A. Summary Judgment Standard

Federal Rule of Civil Procedure 56 provides that summary judgment is warranted where "the pleadings, the discovery and disclosure material on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c)(2). A "genuine issue" exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A fact is "material" if it "might affect the outcome of the suit under governing law." Id.

In deciding a motion for summary judgment, the evidence and the inferences drawn from the evidence must be "viewed in the light most favorable to the party opposing the motion." Addickes v. S.H. Kress and Co., 398 U.S. 144, 158-59, 90 S.Ct.1598, 1609, 26 L.Ed.2d 142 (1970). Summary judgment is proper "only when reasonable minds could not differ as to the import of evidence." Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir. 1991). The function of the court is not "to weigh the evidence and determine the truth of the matter

but to determine whether there is a genuine issue for trial." <u>Anderson</u>, 477 U.S. at 249.

In the context of employment discrimination cases, the United States Court of Appeals for the Second Circuit has explicitly cautioned district courts to use extra care when deciding whether to grant summary judgment because "the ultimate issue to be resolved in such cases is the employer's intent, an issue not particularly suited to summary adjudication." <u>Eastmer v. Williamsville Cent. Sch. Dist.</u>, 977 F. Supp. 207, 212 (W.D.N.Y. 1997) (quoting <u>Gallo v. Prudential Residential Servs.</u>, 22 F.3d 1219, 1224 (2d Cir. 1994)). Nonetheless, "[t]he summary judgment rule would be rendered sterile . . . if the mere incantation of intent or state of mind would operate as a talisman to defeat an otherwise valid motion." <u>Meiri v. Dacon</u>, 759 F.2d 989, 998 (2d Cir. 1985). Indeed, the Second Circuit has noted that "the salutary purposes of summary judgment – avoiding protracted, expensive and harassing trials – apply no less to discrimination cases than to commercial or other areas of litigation." <u>Id.</u>

**B.    Plaintiff's Discrimination Claims under Title VII**

**1.    Title VII Framework**

Under Title VII of the Civil Rights Act of 1964, it is unlawful for an employer to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex or national origin." 42 U.S.C. § 2000e-2(a)(1); <u>Desert Palace, Inc. v. Costa</u>, 539 U.S. 90, 123 S.Ct. 2148, 2150, 156 L.Ed.2d 84 (2003). It is now well settled that discrimination claims brought under Title VII are analyzed under the burden-shifting analysis first set forth by the

United States Supreme Court in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802-04, 93 S. Ct. 1817, 36 L. Ed.2d 668 (1973).  <u>See</u> <u>Reeves v. Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133, 142-43, 120 S.Ct. 2097, 2106, 147 L.Ed.2d 105 (2000).

The burden-shifting test first requires that the plaintiff establish a *prima facie* case of discrimination.  If the plaintiff meets this initial burden and establishes a *prima facie* case, a rebuttable presumption of discrimination arises, and the burden then shifts to the defendant to articulate a legitimate, non-discriminatory reason for the employment action. <u>Texas Dep't of Comt'y Affairs v. Burdine</u>, 450 U.S. 248, 254, 101 S. Ct. 1089, 1094, 67 L. Ed.2d 207 (1981)).  If the defendant succeeds in making this showing, "the presumption of discrimination arising with the establishment of the *prima facie* case drops from the picture."  <u>Weinstock v. Columbia Univ.</u>, 224 F.3d 33, 42 (2d Cir. 2000) (citing <u>St. Mary's Honor Ctr. v. Hicks</u>, 509 U.S. 502, 510-11, 113 S. Ct. 2742, 125 L. Ed.2d 407 (1993)).

Assuming that the defendant meets its burden at the second stage, the burden returns to the plaintiff to prove that the defendant's discrimination was intentional.  In this regard, the plaintiff must produce "evidence that the defendant's proffered, non-discriminatory reason is a mere pretext for actual discrimination." <u>Weinstock</u>, 224 F.3d at 42.  "In short, the question becomes whether the evidence, taken as a whole, supports a sufficient rational inference of discrimination." <u>Id.</u>  However, "[i]t is not enough . . . to disbelieve the employer; the factfinder must [also] believe the plaintiff's explanation of intentional discrimination." <u>Id.</u> (quoting <u>St. Mary's</u>, 509 U.S. at 519).

**2.     Plaintiff's Disparate Treatment Claims**

A Title VII disparate treatment claim arises when a member of a protected class is

treated less favorably than others under circumstances from which an unlawful motive could be inferred. See Schwabenbauer v. Bd. of Ed. of City Sch. Dist. of City of Olean, 667 F.2d 305, 309 (2d Cir. 1981); see also Ott v. Perk Dev. Corp., 846 F.Supp. 266, 275 (W.D.N.Y. 1994).

### a. Plaintiff's *Prima Facie* Case

"The burden of establishing a *prima facie* case of disparate treatment is not onerous." Burdine, 450 U.S. at 253; see also Carlton v. Mystic Transp., Inc., 202 F.3d 129, 134 (2d Cir. 2000) (characterizing the burden as "minimal"). To state a *prima facie* case, a plaintiff must show that (1) he is a member of a protected class, (2) he is qualified for his position, (3) he suffered an adverse employment action, and (4) the circumstances of the adverse action give rise to an inference of discrimination. Weinstock, 224 F.3d at 42 (citing McDonnell Douglas, 411 U.S. at 802). Defendants do not take issue with the first three elements of Damon's *prima facie* case; however, this Court finds it pertinent to analyze the third and fourth elements.

### (1) Adverse Employment Action

To be clear, adverse employment actions can be something other than decisions to hire and fire, or refuse to promote. Adverse employment actions can include involuntarily transferring an employee to a lateral position with different job responsibilities even without a reduction in pay. See de la Cruz v. New York City Human Resources Admin. Dept. Of Social Services, 82 F.3d 16 (2d Cir. 1996) (citing, Collins v. Illinois, 830 F.2d 692, 702-704 (7th Cir. 1987). A purely lateral transfer is one "that does not involve a demotion in form or substance." Harlston v. McDonell Douglas Corp., 37 F.2d 379, 382

(8th Cir. 1994.)

Damon claims he was treated unfavorably in the assignment of tasks in the hub on the basis of gender. (Compl. ¶ 27.) Although Damon was assigned different tasks from time to time, he remained in the position of "hub sorter" throughout the relevant time period. Thus, he was not transferred to a different position, lateral or otherwise. Damon indicated in his papers that he did not want to be in the small sort area of the hub, but did not put forth evidence that such assignment was "materially less prestigious, materially less suited to the skills and expertise, or materially less conducive to career advancement." Galabya v. New York City Bd. of Educ., 202 F.3d 636 (2d Cir. 2000). Thus, there is no indication that the move from the damage cage to small sort rose to the level of a materially adverse employment action. Williams v. Bristol-Myers Squibb Co., 85 F.3d 270, 274 (7th Cir. 1996).

Damon further contends he was disparately treated in the assignment of overtime on the basis of gender. (Compl. ¶ 27.) A denial of overtime can amount to an adverse employment action in some circumstances. Austin v. Ford, 149 F.3d 148, 153 (2d Cir. 1998). Here, Damon argues UPS should have offered him more "extra work" or overtime. (Defendants' Stmt., ¶ 15.) However, to qualify as an adverse action, the allegedly discriminatory action must impact, "the terms and conditions of employment." Galabya, 202 F.3d at 640. As Damon conceded at the arbitration hearing, the assignment he sought did not qualify as "extra work," and working overtime hours was not guaranteed to Damon under the CBA. (See Opinion and Award from New York State Employment Relations Board.) The mere fact that UPS sometimes offered Damon positions that allowed for overtime opportunities did not make overtime a "term or condition" of Damon's

13

employment. <u>Little v. National Broadcasting Co., Inc.</u>, 210 F.Supp.2d 330, 387 (S.D.N.Y. 2002).

Furthermore, Damon's hourly rate of pay was not decreased and his benefits were not altered when he was assigned to small sort. (Defendant's Stmt., ¶ 20.) <u>See</u> <u>Faggiano v. Eastman Kodak Co.</u>, 378 F.Supp.2d 292, 306 (W.D.N.Y. 2005) (citing <u>Como v. O'Neill</u>, 2002 WL 31729509, at *2 (S.D.N.Y. 2002) (holding that where denial of overtime opportunities was only for a short period, salary was not decreased, he was not terminated, and no benefits were lost, there was no adverse action and the motion might be granted on this ground alone). Therefore, the denial of overtime is not considered an adverse employment action in this instance and cannot serve as a basis for Damon's claim of gender discrimination.

### (2)    Inference of Discrimination

Defendants contend that Damon cannot establish a *prima facie* case because he cannot show any alleged adverse employment action occurred under circumstances giving rise to an inference of discrimination. (Defendants' Memo., p. 14.) Specifically, Defendants argue that: (1) the employees who worked Damon's alleged potential overtime hours were not similarly situated, and (2) Damon concedes several males were given overtime hours. (Id. at pp. 14-15.)

Damon failed to put forth evidence to show that he was treated "less favorably than other similarly situated employees outside [the] protected group." <u>Mandell v. County of Suffolk</u>, 316 F.3d 368, 379 (2d Cir. 2003). Damon alleges "the majority of his replacements were women." (Plaintiff's Memo., p. 12.) The women Damon refers to,

Doreen Dunn, Joyce Chrostowski, and Amy Savage, were part-time employees who had less seniority, received less pay per hour, and were not governed by the same sections of the CBA. (Defendants' Stmt., ¶ 35.) Therefore, the part-time employees to which Damon compared himself were not "similarly situated" in all material respects. Shumway v. United Parcel Service, Inc., 118 F.3d 60, 64 (2d Cir. 1997) (citing Mitchell v. Toledo Hosp., 964 F.2d 577, 583 (6th Cir. 1992).

Furthermore, Damon was also replaced by males. For instance, he was replaced by Gary Skobjak, a male, in the damage cage in February, 2002. (Damon Dep. 47: 4-14.) Damon also acknowledged that at least three males who were permitted to continue working in the damage cage after he was reassigned in 2003. (Id. 119:9-120:17; Defendants' Stmt., ¶ 26.) These undisputed facts undermine Damon's claim that UPS discriminated against him in the distribution of overtime hours because he was a male.

However, even if Damon could support a prima facie case on the discrimination claim, Defendants have offered a legitimate, non-discriminatory reason for reassigning Damon to different tasks and denying overtime. Given the minimal burden at this stage, this Court finds it most expeditious to assume the existence of a *prima facie* case and move to the next stage of the analysis. See Besht v. Gen. Motors, 327 F.Supp.2d 208, 212-13 (W.D.N.Y. 2004) (citing United States Postal Serv. Bd. of Governors v. Aikens, 460 U.S. 711, 715, 103 S.Ct. 1478, 1482, 75 L.Ed.2d 403 (1983) ("Where the defendant has done everything that would be required of him if the plaintiff had properly made out a prima facie case, whether the plaintiff really did so is no longer relevant.")); Wado v. Xerox Corp., 991 F.Supp. 174, 187 (W.D.N.Y. 1998).

### b. Defendant's Legitimate, Non-Discriminatory Reason

The burden is now on Defendants to produce a legitimate, non-discriminatory reason for reassigning Damon's damage cage tasks and restricting his overtime. See Reeves, 530 U.S. at 142 (noting that the defendant's burden at the second stage is not one of proof or persuasion, but is more appropriately considered a burden of production.) "This explanation must be 'clear and specific.'" Gallo, 22 F.3d at 1226 (quoting Meiri, 759 F.2d at 997).

UPS maintains that it assigned work to part-time employees when possible in order to decrease overtime costs, which it has the full right to do under the terms and conditions of employment under the CBA. (Defendants' Memo., p. 15.) Based upon Damon's increased rate of pay for overtime, UPS decided, at times, not to allow him to work overtime hours at the completion of his eight hour shift, and instead gave the work to part-time employees who were paid at a lower rate. (Lewandowski Dep. 63:16-22.) Damon acknowledged that part-time employees were paid straight-time, and at a lower hourly rate than he. (Damon Dep. 128:1-17.) Furthermore, Lewandowski testified supervisors were instructed to assign the part-time employee with the lowest seniority to do the extra work. (Lewandowski Dep. 63:16-22.) Lewandowski explained that the person with the lowest seniority in her work area was Amy Savage, then Joyce Chrostowski, and then Doreen Dunn. (Id. 66:2-2.) Based on the above, this Court finds that Defendants have articulated a legitimate, non-discriminatory reason for the decrease in overtime work available to Damon. Consequently, the presumption of discrimination created by Damon's demonstration of a *prima facie* case "drops out of the picture." Hicks, 509 U.S. at 511.

### c.    Pretext for Intentional Discrimination

The burden now returns to Damon to demonstrate that Defendants' non-discriminatory reason is mere pretext for actual unlawful discrimination.  "Where a plaintiff has alleged that an employer's reasons for an adverse employment action are pretextural, all reasonable inferences must be drawn in favor of the plaintiff's showing of pretext." Hudson v. Greyhound Lines, Inc., No. 04 Civ. 10285, 2008 WL 819687 at *7 (W.D.N.Y. 2008) (quoting Joseph v. Manhattan & Bronx Surface Transit Operating Auth., No. 96 Civ. 9015, 2004 WL 1907750, at *14 (S.D.N.Y. Aug. 25, 2004)).   At this stage, the court must "examin[e] the entire record to determine whether the plaintiff could satisfy his 'ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff.'" Schnabel v. Abramson, 232 F.3d 83, 90 (2d Cir. 2000) (quoting Reeves, 530 U.S. at 143.)  This requires the court to determine whether "there is sufficient potential proof for a reasonable jury to find the proffered legitimate reason merely a pretext for impermissible retaliation." Richardson v. New York State Dep't of Corr. Serv., 180 F.3d 426, 443 (2d Cir. 1999).

A defendant's proffered non-discriminatory reason, however, "cannot be proved to be a 'pretext for discrimination' unless it is shown both that the reason was false, and that discrimination was the real reason." Olle v. Columbia Univ., 332 F.Supp.2d 599, 617 (S.D.N.Y. 2004) (quoting St Mary's, 509 U.S. at 502); see also AB v. Rhinebeck Cent. Sch. Dist., 224 F.R.D. 144, 153 n.9 (S.D.N.Y. 2004).  Therefore, to avoid summary judgment, Plaintiff must establish the existence of a genuine issue of fact as to whether Defendants'

proffered explanations are false and a mere pretext for unlawful discrimination. <u>Weinstock</u>, 224 F.3d at 42. Unless Damon can point to evidence that reasonably supports a finding of prohibited discrimination based on his gender, defendants are entitled to summary judgment on his disparate treatment claim. <u>See</u> <u>James</u>, 233 F.3d at 154.

Simply being treated differently than one's co-workers is not actionable under Title VII. To be actionable, the motivation for the disparate treatment must be based on one of the prohibited factors in Title VII. Here, there is no disputed issue of material fact or any evidence from which a reasonable factfinder could conclude that UPS reassigned Damon or withheld overtime hours because he was a male. First, Damon has not put forth any evidence to rebut UPS's business decisions to save money on overtime and even admits that the part-timers who were assigned "extra work" were paid at a lower rate than he would have been. (Id. 128:8-13.) Second, Damon has identified his replacements as males in most assignments and stated that both male and female part-time employees were allowed to work what would have been his overtime hours. (Id. 128:118-121.)

Damon has thus failed to carry his burden of putting forth evidence from which a reasonable trier of fact could conclude that UPS's legitimate, non-discriminatory reason for his task reassignments in the hub and denial of overtime is false, and that UPS actually discriminated against him based on his gender. UPS is therefore entitled to summary judgment on his disparate treatment claims. <u>See</u> <u>James</u>, 233 F.3d at 154; <u>see</u> <u>Lizardo v. Denny's, Inc.</u>, 270 F.3d 94, 104 (2d Cir. 2001) (per curiam) (affirming district court's granting of summary judgment where the plaintiffs did "little more than cite to their mistreatment and ask the court to conclude that it must have been related to their race.")

Its motion seeking such relief will therefore be granted.

### 3.    Plaintiff's Hostile Work Environment Claims

The Supreme Court has held that Title VII's protection extends beyond "economic" or "tangible" discrimination.  Harris v. Forklift Sys., 510 U.S. 17, 21, 114 S.Ct. 367, 370, 126 L. Ed. 2d 295 (1993) (citing Meritor Savings Bank, FSV v. Vinson, 477 U.S. 57, 64, 106 S.Ct. 2399, 91 L.Ed. 2d 49 (1986)).  Rather, Congress enacted Title VII to "strike at the entire spectrum of disparate treatment of men and women in employment," including the requirement that employees work in a hostile or abusive environment.  Harris, 510 U.S. at 21.

To survive a motion for summary judgment, a plaintiff claiming that he was the victim of a hostile work environment must produce evidence from which a reasonable trier of fact could conclude "(1) that the workplace was permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter the conditions of [his] work environment, and (2) that a specific basis exists for imputing the conduct that created the hostile environment to the employer."  Mack v. Otis Elevator Co., 326 F.3d 116, 122 (2d Cir. 2003) (quoting Richardson, 180 F.3d at 436).  "The sufficiency of a hostile work environment claim is subject to both subjective and objective measurement: the plaintiff must demonstrate that [he] personally considered the environment hostile, and that the environment rose to some objective level of hostility."  Leibovitz v. New York City Transit Auth., 252 F.3d 179, 188 (2d Cir. 2001).

Courts examine various factors to ascertain whether a work environment is sufficiently hostile or abusive to support a Title VII claim.  These factors include "the

frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's performance."  Leibovitz, 252 F.3d at 188 (citing Harris, 510 U.S. at 23); Terry v. Ashcroft, 336 F.3d 128, 147-48 (2d Cir. 2003).  Isolated and occasional instances of harassment do not ordinarily rise to this level.  See Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 270-271, 121 S. Ct. 1508, 149 L. Ed. 2d 509 (2001) (per curiam).  The appropriate test is whether the "harassment is of such quality or quantity that a reasonable employee would find the conditions of her employment altered for the worse. . . ." Torres v. Pisano, 116 F.3d 625, 632 (2d Cir. 1997).  The Second Circuit has stated:

> The environment need not be unendurable or intolerable.  Nor must the victim's psychological well-being be damaged.  In short, the fact that the law requires harassment to be severe or pervasive before it can be actionable does not mean that employers are free from liability in all but the most egregious cases."

Terry, 336 F.3d at 147-48 (quotations, citation and alterations omitted).

Defendants argue that Damon's four alleged incidents, two of which were imputed to Schmaus and two to Lewandowski, are not enough to establish severe conduct such that a hostile work environment was created.  (Defendants' Memo., p. 18.)  The comments regarding his appearance and work ethic were not so "extraordinarily severe" to have altered the conditions of Damon's working environment.  Cruz v. Coach Stores, Inc., 202 F.3d 560, 570 (2d Cir. 2000).  Even if these alleged comments included profanity or were said in an elevated or "nasty" tone of voice, these few instances do not sufficiently implicate Title VII.  The standard for sever conduct, as set out in Meritor, does not include "mere

utterance of an... epithet which engenders offensive feelings in an employee." <u>Meritor Sav. Bank, FSB v. Vinson</u>, 477 U.S. 57, 67 (U.S. 1986) (quoting, <u>Henson v. City of Dundee</u>, 682 F.2d 897, 904 (11th Cir. 1982). Rather, conduct must be so severe as to "create an objectively hostile or abusive work environment- an environment that a reasonable person would find hostile or abusive." <u>Harris</u>, 510 U.S. at 21. Damon stated only that he felt embarrassed due to the comments (Damon Dep. 159:8). His occasional embarrassment is not sufficient to suggest that a reasonable person would consider the comments to amount to a hostile or abusive work environment. Furthermore, these four incidents which occurred over a two year period, are "too few, too separate in time, and too mild... to create an abusive working environment." <u>Alfano v. Costello</u>, 294 F.3d 365, 380 (2nd Cir. 2002).

Therefore defendants are entitled to summary judgment on Damon's hostile work environment claims on this basis. Because Damon has not established the first element of a *prima facie* case of hostile work environment, this Court need not address the second element. Defendants' motion for summary judgment on Damon's hostile work environment claims will be granted.

## C. State Law Claims

Damon's claims under the NYHRL are identical to his Title VII claims. Disparate treatment and hostile work environment claims under the NYHRL "are generally governed by the same standards as federal claims under Title VII." <u>Van Zant v. KLM Royal Dutch Airlines</u>, 80 F.3d 708 (2d Cir. 1996). Accordingly, this court will not address the NYHRL

claims separately. Based on the analysis above granting Defendants' motion for summary judgment under Title VII, Defendants' motion is also granted under the NYHRL.

## IV. CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment is granted.

## V. ORDERS

IT HEREBY IS ORDERED, that Defendants' Motion for Summary Judgment (Docket No. 56) is granted consistent with this Decision and Order and the Complaint is dismissed in its entirety. Further, that the Clerk of Court is directed to close this case.

SO ORDERED.

Dated: October 31, 2010
Buffalo, New York

_____
s/William M. Skretny
WILLIAM M. SKRETNY
Chief Judge
United States District Court